PHILLIP A. TALBERT
United States Attorney
ANDRE M. ESPINOSA
KATHERINE T. LYDON
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:16-CR-0024-MCE |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL BRIEF |
| v. | TRIAL DATE: April 17, 2017<br>TIME: 9:00 a.m.<br>COURT: Hon. Morrison C. England |
| HELAMAN HANSEN, | |
| Defendant. | |

## I.   INTRODUCTION

Trial begins on April 17, 2017, at 9:00 a.m. The estimated trial time is approximately nine court days (for the government's case). Defendant Helaman Hansen is out of custody. He is charged in the superseding indictment with thirteen counts of mail fraud (18 U.S.C. § 1341), three counts of wire fraud (18 U.S.C. § 1343), and two counts of encouraging and inducing illegal immigration for private financial gain (8 U.S.C. § 1324 (a)(1)(A)(iv) & (B)(i)).

## II.   STATEMENT OF RELEVANT FACTS

### A.   Summary of the Scheme

In or about February 2015, the FBI and Homeland Security Investigations ("HSI") received separate complaints concerning a suspected fraud scheme among principals and certain employees of Americans Helping America Chamber of Commerce ("AHA"), a non-profit organization based in

1

Sacramento, and AHA-related entities.  The complaints alleged that the founder and then-CEO of AHA, defendant Helaman Hansen ("Defendant") was the leader of a group engaged in a scheme to defraud undocumented immigrants residing in California and elsewhere by charging them exorbitant fees in exchange for fraudulent immigration advice and assistance.  Defendant's scheme centered on an elaborate adult-adoption program, dubbed the "Migration Program," which Defendant and his agents promised AHA "clients" would result in legal U.S. citizenship within a year or two after adoption by an American citizen and the completion of additional tasks.  Subsequent law enforcement investigation into AHA and its affiliated entities[1] revealed that between October 2012 and September 2016, hundreds of victims from all over California and elsewhere were defrauded by Defendant's scheme.  Together, those victims paid hundreds of thousands of dollars to AHA and its related entities in reliance on false promises by Defendant and his agents that adoption by a U.S. citizen would result in U.S. citizenship. To induce victims to participate in his scheme, Defendant and his agents also falsely assured them that past AHA "clients" had successfully become U.S. citizens through Defendant's adult-adoption program. Later, Defendant admitted that was not true, that no one had achieved citizenship through his program, and that the program could not result in citizenship.  Defendant also admitted that he was the only person at AHA who knew his adult-adoption program could not result in citizenship for the victims he recruited.

To accomplish his scheme, Defendant marketed and sold annual "memberships" to AHA's Migration Program – at first for as little as $150 per year and later for as much as $10,000 per year – to adult undocumented immigrants living in the U.S.  As part of the scheme, Defendant and his agents delivered on their initial promise to complete an adoption of the victim by an adoptive parent identified by the victim or, in other instances, provided by AHA.  After the adoption, Defendant and his agents required victims to obtain certain formal government documents in their new adoptive names, including an adoption order, a delayed registration of birth, a driver's license, and an individual tax identification

---

[1] Those related entities include, Native Hawaiians and Pacific Islanders ("NHPI"), and Community Independent Business Owners ("CIBO").  Initially, Defendant oversaw all three entities from a single office. Later, Defendant opened a second office a short distance from the original office space.

1   number ("I-TIN").  Defendant and his agents also required victims to obtain certain informal

2   commercial documents in their new adoptive names, including a utility bill, a vehicle registration, a

3   library card, a bank account number, proof of health and life insurance, identification cards from

4   employers or educational institutions, and membership cards to civic organizations, big-box retail stores,

5   and other clubs.  Defendant described the collection of these documents as building a "profile" he would

6   later submit for "verification."

7        Defendant's promises of U.S. citizenship to his victims were lies.  The path to U.S. citizenship

8   he offered, which involved the filing with U.S. Citizenship and Immigration Services ("USCIS") of a

9   Form I-130 Petition for Alien Relative, is closed to aliens who were not adopted by the age of sixteen

10  (with minor exceptions for nunc pro tunc orders issued retroactive to the filing of an adoption petition

11  that preceded the adoptee's sixteenth birthday).  That was no secret to Defendant.  The face of the Form

12  I-130 petition includes a warning that the form is for use only in connection with adoptions completed

13  before an alien's 16th birthday.  Additionally, in October 2012, USCIS rejected a Form I-130 petition

14  filed on behalf of an AHA victim who was adopted as an adult.  In the rejection letter sent to Defendant,

15  USCIS made clear that the Form I-130 path was closed to aliens adopted after the age of 16.  USCIS

16  also denied several other Form I-130 petitions Defendant filed or caused to be filed.  Nevertheless,

17  during the period of the scheme, Defendant, by his own admission, lied to victims by telling them that

18  many past AHA "clients" had become U.S. citizens after participating in AHA's Migration Program.

19  On the basis of that fundamental misrepresentation, Defendant and those acting at his direction induced

20  hundreds of desperate victims to pay them hundreds of thousands of dollars for something Defendant

21  could never deliver.[2]

22        There were other fraudulent aspects to Defendant's scheme.  Defendant hired recruiting agents to

23  locate and solicit victims to join AHA's fraudulent Migration Program.  Those recruiting agents

24

25        [2] None of the above listed documents could impact a USCIS determination of eligibility for an immigration
    status adjustment.  Indeed, as a matter of law, no path exist for adult aliens living in the United States illegally to
26  adjust their immigration status through adoptions sought, completed, and effective after their 18th birthday.  See
    Superseding Indictment (Docket #62) at ¶¶ 6-11.

27                                                        3

28

1   received a commission of approximately $1,500 for each victim they persuaded to join the program.

2   Defendant and his agents also offered those recruiters the opportunity to adopt victims of the scheme.

3   Defendant and his agents would include false information in victim adoption petitions.  For example, if a

4   victim of the program was not a resident of California or the county in which an adoption petition was to

5   be filed, Defendant his agents would include a false address in that victim's adoption petition so that the

6   petition could be considered by the court in which it was filed.  Defendant and his agents instructed

7   victims how to respond to potential questions from the judge or others about the purpose of their

8   adoptions, including instructing them not to mention the adoption was for citizenship or that money had

9   changed hands.  Defendant and his agents also urged victims of AHA's Migration Program to "invest"

10  in AHA, and offered victims the opportunity to purchase up to 10,000 "shares" of worthless AHA

11  "stock" for $1 per share.  Defendant promised victims that AHA would convert a portion of the victims'

12  membership fees into AHA shares at a price of $.20 per share.  Defendant promised victims who bought

13  AHA stock that the purported investment would mature and yield dividends after three years of

14  payments.

15      Defendant relied on the appearance of legitimacy to operate his scheme to lull his victims into

16  suppressing doubts and to reject advice from skeptical friends or family.  He relied on the requirements

17  imposed on victims of AHA's Migration Program to extend the period of time necessary for victims to

18  complete the program.  That tactic resulted in payments of additional membership fees by victims who

19  could not complete the program within one year.  It also permitted Defendant to expand the scope of

20  time available before victims complaints over not attaining citizenship would cause detection of his

21  scheme. Defendant's wide advertising for the Migration Program provided a forum for him to

22  disseminate false information about the program to potential victims and to lull participating victim with

23  false assurances about the legitimacy of the program.

24      Defendant relied on word-of-mouth and print advertising, presentations to church congregations,

25  and uploaded dozens of videos of varying lengths marketing AHA's Migration Program to official

26  websites for AHA, its subsidiaries, and elsewhere online.  Videos uploaded to YouTube channels

27

28

1    controlled by Defendant included a series from approximately June 2015, titled: "US Citizenship

2    Through Adult Adoption [parts 1 through 4]."  In the fourth video in that series, Defendant stated that

3    the "law" permitting AHA's Migration Program is not an American law.  Rather, he falsely claimed the

4    program was established under a United Nations law that provides that a person adopted in a court of a

5    particular country receives the same citizenship rights as if that person was born in that country.

6    Defendant also falsely stated that through AHA's Migration Program, victims "inherit the citizenship

7    rights" of the adopting parents.

8         To conceal his scheme and avoid detection by victims and others, Defendant and his agents were

9    evasive about the details and the legal foundation of AHA's Migration Program.  On certain occasions,

10   Defendant also told skeptics he met with a retired United States Supreme Court Justice who had written

11   a law permitting AHA's Migration Program and who taught Defendant how to implement it.  In other

12   instances, Defendant told skeptics that the program was authorized under a United Nations law that

13   superseded United States law.  On certain occasions, Defendant also falsely assured victims and others

14   that his wife, Viola, attained citizenship through an adult adoption.  In reality, she naturalized after

15   becoming a legal permanent resident of the United States, via a DV2 visa issued to her as Defendant's

16   spouse after Defendant's received a DV1 "lottery" visa.

17        Two of Defendant's Migration Program victims travelled to the United States on legal visas.

18   Both presented the impending expiration of his visa to Defendant, at different times.  Defendant

19   instructed each to overstay his visa and to remain in the United States illegally.  In one instance,

20   Defendant employed one of the victims and paid him a stipend, amking it ewasier for the victim to heed

21   Defendant's encouragement to overstay his visa.  Defendant charged both victims for participation in the

22   Migration Program.

23        **B.    Search Warrants and Interview of Defendant**

24        In the course of the investigation, federal agents conducted search warrants at Defendant's two

25   business locations in Sacramento and his personal residence in Elk Grove.  During the searches, agents

26   recovered multiple computers used at AHA, NHPI, and CIBO offices to conduct the fraud scheme.

27                                            5

28

Agents also recovered approximately 75,000 pages of documents, including paper files containing collections of records relating to individual victims of AHA's Migration Program.  Agents recovered paper advertisements for the Migration Program and booklets setting forth details of the program. Agents also recovered training materials promising citizenship to AHA "clients" within one year, and written guidance to AHA employees attending adoption hearing with "clients" to instruct those "clients" to mislead judges about the fact that adoptees were paying AHA and were pursuing adoption as a path to citizenship.

During the search of his business offices, Defendant agreed to a voluntary, audio-recorded interview and offered a lengthy statement concerning aspects of the Migration Program.  During that interview, Defendant stated, among other things, the following:

- In 2003 he spoke to a United States Supreme Court Justice who Defendant claimed explained to him the legal justification for AHA's adult-adoption-to-citizenship program. Defendant claimed that the Justice said to him: "'listen, I want to help people; leave it with you. Leave me out of it.' He gave me his cards and he gave me where to look at the library; pull up all of the documents. Most of the paper in California … he was the one who created all those paper-works, the legal paper-works." Defendant declined to identify the Justice.

- The "law" permitting AHA's Migration Program is not an America law but, rather, a United Nations law, and adult adoptees "inherit" the citizenship of adoptive parents, and when a person is adopted by a court of in the United States that person receives the same citizenship rights as if that person was born in the United States.

- AHA charged customers of its Migration Program between $7,500 and $10,000, and employed approximately twenty-five or thirty agents, who "fly all over" to recruit customers receive approximately $1,500 for each recruited customer.

- No one from the United States government had ever told Defendant that the AHA Migration Program can lead to United States citizenship.

- AHA never filed Form I-130 applications with USCIS on behalf of its customers, a

6

position Defendant abandoned when confronted by completed Form I-130 applications filed by AHA – at least one of which bore his signature, which he identified.  Thereafter, he admitted AHA *had* filed Form I-130 applications in the past. He stated that he filed those forms in error and that "adult adoption has got no form in the Immigration," and he was operating under a "trial and error" process "to get things right in paperwork."

- "[Q]uite a few hundred" AHA customers had become U.S. citizens through AHA's Migration Program.

- In the past, he "guaranteed" many prospective AHA customers – who were considering paying to enroll in AHA's Migration Program – that the program would result in U.S. citizenship and that many prior AHA customers had become citizens through the program.

- He could not provide proof that the Migration Program works because AHA "destroys the file" of customers who successfully become U.S. citizens.  He also relied on an internal AHA privacy policy that he claimed prevented him from disclosing the identities of AHA customers who had become U.S. citizens through the program.

- He read that USCIS's explanation that it denied a Form I-130 application AHA and Defendant had filed on behalf of an AHA customer, in part, because USCIS determined that adult adoptions cannot confer an immigration status benefit.

- He had lied to the agents when he stated that hundreds of AHA customers had become United States citizens through AHA's Migration Program. He lied in the past to prospective AHA customers when he told them that many prior AHA customers had successfully become U.S. citizens through AHA's Migration Program. He knew no AHA customers had become a United States citizen through the program but told prospective AHA customers the opposite.

- He admitted to agents that they were "dead right" that he knew that "zero" AHA customers had become U.S. citizens through AHA's Migration Program but he told prospective customers the opposite. When asked why he told prospective AHA customers – who were considering paying thousands of dollars to enroll in AHA's Migration Program – that past customers had become

1  U.S. citizens through the program if he knew the program had never resulted in citizenship for any

2  customer, Defendant answered, in part: "I still say it's going to work."

3    • He claimed he was the only person who knew AHA's Migration Program had never

4  resulted in U.S. citizenship for any AHA customer, and claimed he had not shared that information with

5  his agents and employees because "because I want the things to work. Because I know the law will have

6  to provide for it."

7                              **III.    EVIDENCE**

8      **A.    Witnesses**

9          The government will file a witness list in this case.  The government will err on the side of

10  including witnesses and may not call every witness on the list, particularly in view of how the case

11  develops at trial. The government's investigation of the case and preparation for trial continues, and the

12  government reserves the right to add witnesses should it become necessary.

13          These witnesses are, generally:

14    • Law enforcement agents who conducted surveillance, participated in search warrants,
        interviewed Defendant, and who will introduce Rule 404(b) evidence.

15    • Forensic agents who searched computers.

16    • Summary agents and/or analysts who reviewed voluminous records and who can testify to
17      summaries of the records' contents.

18    • Two confidential human sources who have personal knowledge of aspects of the scheme.

19    • Victims of Defendant's scheme.

20    • Former employees of AHA, NHPI, and/or CIBO.

21    • A former recruiter employed by AHA to solicit victims of Defendant's scheme.

22    • An IRS revenue agent who will testify about the delivery by mail of I-TINs.

23    • A representative of California Department of Health and Human Services who will testify
        about the mailing of delayed registrations of birth.

24    • An agent from the United States Citizenship and Immigration Services who will testify
25      regarding programs permitting immigration status adjustments based on adoptions.

26    • FBI technicians who downloaded and preserved videos Defendant cause to be uploaded

27                                    8
28

to the Internet.

- An investigator from the Alameda County District Attorney's Office who investigated AHA's use of false addresses on adoption petitions filed in Alameda County Courts.
- A representative from the New York Federal Reserve Bank / Fedwire who will testify about the interstate commerce aspects of wire payments to Defendant from victims.
- A representative from Liquid Web who will testify about the interstate commerce aspects of an email sent to one of Defendant's agents from a victim.
- A Sacramento County Sheriff's Department officer who will provide a foundation for a recorded jail call in which Defendant stated: "I knew I would end up here," and "I pushed it too far."

**B.      Documents and Business Records**

The records in this case are voluminous and include bank records and records from Fedwire, LiquidWeb, and Federal Express, among others.  The parties have reached a stipulation as to the foundational admissibility of certain of these business records.  The government will also rely on public records, including delayed registrations of birth issued to victims, adoption orders and other court documents associated with those victims, and records from Alien Files ("A-Files") for Defendant, his wife, and certain others.  As discussed more below, due to the volume of bank records, the information in those records will be introduced to the jury through the use of summary charts and testimony.  The government will also present business records seized from AHA offices during the execution of search warrants at those locations, which constitute Defendant's statements or statements of his agents, or otherwise admissable.

**C.      Evidence Obtained Through Computer Forensic Examinations**

Agents trained in computer forensics have downloaded information from computers seized in the course of the investigation of this matter.  Testimony concerning some of the information found on those computers may be introduced during the trial.

**D.      Audio and Video Recordings**

Excerpts of some of Defendant's audio and video-recorded statements may be introduced by the

9

government during the trial.[3]  Likewise, excerpts of some of the videos Defendant cause to be uploaded to the Internet may be introduced by the government during the trial.

## IV.    THE SUPERSEDING INDICTMENT

Defendant is charged in the superseding indictment with thirteen counts of mail fraud, three counts of wire fraud, and two counts of encouraging and inducing illegal immigration for private financial gain.

### A.    Mail Fraud—18 U.S.C. § 1341

The elements of mail fraud are:

First, Defendant knowingly participated in, devised, or intended to devise, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, Defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

Fourth, Defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

A mailing need only be incident to an essential part of the scheme or plan, and may occur after money or property has been fraudulently obtained if the mailing is necessary to complete and essential part of the scheme or plan. *Schmuck v. United States*, 489 U.S. 705, 711 (1989).  It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.  *See* Ninth Circuit Model Crim. Jury Instr. 8.121.

///

---

[3] In addition to the interview he gave during the execution of search warrants at AHA offices in December 2015, after his arrest in February 2016, Defendant participated in a second lengthy interview with law enforcement agents, which was video recorded.

**B.**   <u>**Wire Fraud—18 U.S.C. § 1343**</u>

The elements of wire fraud are:

First, Defendant knowingly participated in, devised, or intended to devise, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

**C.**   **Encouraging and Inducing Illegal Immigration for Private Financial Gain—8 U.S.C. § 1324(a)(1)(A)(iv) & (B)(i)**

The elements of encouraging and inducing illegal immigration for private financial gain are:

First, the person was an alien;

Second, Defendant encouraged or induced the alien to come to, enter, or reside in, the United States in violation of law; and

Third, Defendant knew or aacted in reckless disregard of the fact that the alien's coming to, entry into, or residence in the United States would be in violation of the law.

An alien is a person who is not a natural-born or naturalized citizen of the United States.

An alien enters the United States in violation of law if not duly admitted by an Immigration Officer.

During deliberations, the jury will also determine whether based on the evidence, they find beyond a reasonable doubt that Defendant acted for private financial gain. *See United States v. Mejia-Luna*, 562 F.3d 1215, 1219–20 (9th Cir. 2009) (approving use of a special verdict form on which the jury unanimously found beyond a reasonable doubt that, in connection with the commission of the offense, the defendant acted for the purpose of obtaining a commercial advantage or private financial

11

1   gain); *United States v. Singh*, 532 F.3d 1053, 1062–63 (9th Cir. 2008) (finding no error when special

2   verdict form concerning private financial gain did not state burden of proof on question was beyond a

3   reasonable doubt, in view of overall instructions, which included a single burden-of-proof instruction).

## V.   **EVIDENTIARY ISSUES**

### A.   **Stipulations**

6   Based on conversations with defense counsel, the government expects to reach a stipulation with

7   the defense concerning certain business records and to file that stipulation with the Court prior to the

8   start of trial.  Specifically, the parties anticipate a stipulation regarding the foundational admissibility of

9   certain bank records, FedWire records, and FedEx records.  With respect to the bank records, the

10  stipulation will reserves the parties' right to object to the admission of the records on other grounds such

11  as relevance.

### B.   **Defendant's Statements**

13  At trial, the government will offer certain of Defendant's prior, out-of-court statements as

14  evidence of his guilt concerning the charges against him.  Those prior, out-of-court statements include

15  Defendant's statements: (i) to law enforcement officers, during two separate interviews and during an

16  earlier tour of Defendant's office; (ii) to his employees and agents; (iii) to victims of his fraudulent

17  Migration Program; (iv) in video-recordings Defendant caused to be posted to the Internet; and (v) in

18  recorded calls Defendant made from the Sacramento County Jail.  The United States has disclosed to

19  Defendant copies of all of the prior, out-of-court statements from which it will select excerpts to offer

20  against him.

21  The government may elicit testimony regarding the defendants' own statements and representations,

22  both to fact witnesses and to law enforcement. Fed.R. Evid. 801(d)(2). On the other hand, the defendants'

23  own out-of-court statements, when offered by the defendant, are hearsay and inadmissible. Fed.R.Evid.

24  801(c). Thus, the defendants cannot introduce their own statements through other witnesses but, instead,

25  must testify in Court if they wish to offer such testimony. *United States v. Mitchell*, 502 F.3d 931, 964-65

26  (9th Cir. 2007) ("These statements [by defendant] were inadmissible hearsay; as [defendant] was attempting

to introduce them himself, they were not party-opponent admissions, nor did the fact that they were made more broadly self-inculpatory confession bring them within the statement-against-interest exception"); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (affirming trial court's preclusion of defendant eliciting on cross-examination exculpatory statements given to law enforcement officer); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) ("It seems obvious defense counsel wished to place [defendant's denial to police officer] before the jury without subjecting [defendant] to cross-examination, precisely what the hearsay rule forbids.").

Additionally, the so-called Rule of Completeness under Federal Rule of Evidence 106 is not a vehicle through which Defendant may drive into evidence otherwise inadmissible self-serving hearsay. It exists only to avert "misunderstanding or distortion" caused by introduction of only part of a document. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988). The Rule "does not require the introduction of any unedited writing or statement merely because an adverse party has introduced an edited version." *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014). The Rule does not compel admission of otherwise inadmissible hearsay evidence. *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir.1981) (court did not abuse its discretion in excluding evidence under Rule 106 because it was irrelevant and inadmissible hearsay); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir.1996) (Rule 106 does "not render admissible the evidence which otherwise is inadmissible under hearsay rules"). At trial, the Court should decline Defendant's invitation to misapply Rule 106 to dilute the clarity and impact of his incriminating statements with his many irrelevant and self-serving statements. Defendant may attempt to "clarify" his incriminating statements by testifying at trial.

## C.   Statement of Defendant's Employees and Agents

Most statements made by Defendant's employees or contained in promotional materials are not hearsay because the government will not offer them to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Rather, many of the statements claim victims would become citizens if they participated in the Migration Program. The government will offer those statements to establish that the statements were made or to demonstrate the effect the statements had on the hearer. The Ninth Circuit has held that

statements by employees of a fraudulent venture offered simply to prove that the statement was made are not hearsay. *See United States v. Anfield*, 539 F.2d 674, 678 (9th Cir. 1976). For example, "statements of salespersons misrepresenting the program [are] admissible to prove that the misrepresentations were made, not to prove the truth of what the salespersons stated." *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988).

To the extent the direct statements made by Defendant's employees about the Migration Program were offered for their truth, they would fall within the agent admissions hearsay exception, because they were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 803(d)(2). The main and possibly only revenue stream of AHA, NHPI and CIBO during the relevant period consisted of payments from victims to participate in a program they believed would yield them U.S. citizenship. Thus, any statements employees of AHA, NHPI or CIBO made about the Migration Program would be within the scope of their agency or employment. *See Kirk*, 844 F.2d at 63 (holding that statements by agents or employees of a defendant which "primarily describe the nature and quality of the time share unit and the nature and extent of contractual obligations to prospective time share customers, therefore clearly falling within the scope of agency or employment.").

### D.   Agent Testimony

Some of the government's case will be proven through introduction of the business records of third parties such as banks and through public records. FBI Special Agent Brady Cowan or an FBI analyst may present some of these documents. The agents may also testify about statements the defendants made in the course of interviews, the contents of which have been provided in reports and recordings in discovery.

### E.   Summary Charts

The government will introduce into evidence summary charts that summarize "the contents of voluminous writings, recordings or photographs which cannot be conveniently examined in court." Fed. R. Evid. 1006. This Court has already granted the government's motion to admit such summary charts

1  pursuant to Rule 1006, under which summaries of voluminous records become the evidence.[4]

2  **F.    Possible Fifth Amendment Assertions By Witnesses**

3  The government anticipates calling a number of former employees of AHA, NHPI, and CIBO

4  who were employed during period in which Defendant operated his fraud scheme.  At this time, the

5  government does not anticipate needing to immunize any witnesses to compel testimony.  If necessary,

6  the government may present witnesses who will testify under a grant of immunity pursuant to 18 U.S.C.

7  § 6002.  Such immunity requires that "while the government may prosecute the witness for an offense

8  related to the subject matter of the witness's testimony, the testimony itself and any fruits thereof may

9  not be used against the witness in any criminal case except a prosecution for perjury araising out of the

10 testimony."  *United States v. Lord*, 711 F.2d 887, 890 (9th Cir. 1983) (internal quotation marks omitted).

11 The government has submitted request for appointment of counsel for eight former AHA, NHPI,

12 and CIBO employees.[5]  If a valid assertion of privilege is made, the government will be prepared to seek

13 an order from the Court pursuant to 18 U.S.C. §§ 6002-3.

14 **G.    Inextricably Intertwined / Rule 404(b)404(b) Evidence**

15 The government has provided Defendant with notice of its intent to introduce inextricably

16 intertwined with the charged offenses or, alternatively, evidence admissible under Fed. R. Evid. 404(b).

17
18 [4] The Ninth Circuit has recognized that summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses." *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (quoting *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)); *see also United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (approving the use of a summary witness where the sequence of events was confusing and the chart contributed to the clarity of presentation). Although the underlying materials upon which the summary testimony is based must be "admissible," they need not be actually admitted into evidence. *See Meyers*, 847 F.2d at 1412. The foundation for admission of such a summary is simply that the records are voluminous and that in-court examination would be inconvenient. *United States v. Duncan*, 919 F.2d 981, 988 (5th Cir. 1990); *see also Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (summary testimony of IRS agent concerning voluminous records admissible).

[5] The government has not found evidence that the witnesses are culpable in Defendant's fraud.  Indeed, the weight of the evidence supports the conclusion that Defendant carried out his fraud scheme without their knowledge.  As set forth above, in a post-arrest interview Defendant admitted only he knew the Migration Program had never worked and could not work.  Moreover, in addition to a general exculpation of other AHA, NHPI, and CIBO employees, Defendant specifically exonerated his top-level deputies by name.  In an abundance of caution, the government has sought appointment of counsel for the former AHA employees we plan to call at trial.  From an objective perspective, each witness was an employee of AHA during Defendant's fraud scheme.  Thus, admitting employment and discussing their duties could be viewed as self-incriminating, notwithstanding an accompanying denial of any knowledge of Defendant's fraud.

15

This Court granted the government's motion to admit such evidence under both bases.  The government may or may not introduce this evidence at trial.  The evidence is as follows: (A) evidence that Defendant and his employees and agents instructed customers of the Migration Program to mislead the courts considering adoption petitions sponsored by AHA and NHPI about material facts concerning those adoptions including, among other things: (i) their true purpose; (ii) the true nature of the relationships between adoptive parent and the individual seeking adoption; and (iii) whether the individual seeking adoption had paid to facilitate the adoption; (B) evidence of Defendant's sale of unregistered securities as part of the Migration Program; and (C) evidence that Defendant operated a scheme substantially similar to the fraudulent Migration Program, before 2012.

### H. Issues Related to Closing Arguments

Defendant may call witnesses and the government may comment on their failure to do so. "A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify." *United States v. Cabrera*, 201 F.3d 1243, 1249 (9th Cir. 2000) (citing cases).  If a defendant does testify, a prosecutor may characterize the defendant's testimony as false. *Id.* at 1250.

### VI. DEFENSE CASE

### A. Diminished Capacity Defense

Defendant provided the government with notice of a diminished capacity defense.  He timely provided an expert report.  In that report, Defendant's expert opined that Defendant's purported Bipolar II Disorder "is driving the behavior that led to the current charges," and that "chronic hypomania is the best explanation for [Defendant's] behavior involved in the current case."  Those opinions directly violates Rule 704(b) by opining on whether Defendant did or did not have the mental state constituting an element of the offense.  Rule 704(b) allows expert testimony on a defendant's mental state only if the expert "does not draw the ultimate inference or conclusion for the jury." *United States v. Finley*, 301 F.3d 1000, 1015 (9th Cir. 2002); *see also Morales*, 108 F.3d at 1033 (holding that an expert may "give an opinion

16

on a predicate matter from which a jury might infer the defendant's required mens rea").  Testimony

limited to an expert's diagnoses and the results of the psychological evaluation the expert gave a

defendant should not run afoul Rule 704's restriction.  *See Finley*, 301 F.3d at 1015.

Here, the opinions of Defendant's expert run afoul of Rule 704(b) because both draw the

ultimate inference or conclusion for the jury:  that Defendant lacked the requisite mental state to commit

the crimes charged in the Superseding Indictment.  At the hearing on the parties' motion in limine

Defendant implicitly conceded the impropriety of his expert's proffered opinions when he agreed "not

ask [the expert] to state his 'opinion about whether the defendant did or did not have a mental state that

constitutes an element of the crime charged or of a defense.'"  See Docket #78 at 8-9.  The opinions

proffered by Defendant's expert in his report necessarily answer that question, whether asked directly or

otherwise.  At trial, the Court should order Defendant to instruct his expert not to conflate testimony

about Defendant's diagnosis and symptoms with a conclusion that those things are responsible for

Defendant's criminal conduct.

Dated:  April 10, 2016

PHILLIP A. TALBERT
United States Attorney


By:   /s/ ANDRÉ M. ESPINOSA
      ANDRÉ M. ESPINOSA
      KATHERIN T. LYDON
      Assistant United States Attorneys

17