1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF CALIFORNIA
2       BEFORE THE HONORABLE MORRISON C. ENGLAND, JR., JUDGE

3                       ---o0o---

4
    UNITED STATES OF AMERICA,
5
          Plaintiff,
6
    Vs.                          CASE NO. 2:16-CR-024 MCE
7
    HELAMAN HANSEN,
8
          Defendant.
9   _____/

10                      ---o0o---

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS
         RE:  MOTION TO DISMISS COUNTS 17 & 18,
12                JUDGMENT AND SENTENCING
         THURSDAY, DECEMBER 14TH, 2017, 10:00 A.M.
13                      ---o0o---

14  APPEARANCES:

15  For the Government:       OFFICE OF THE UNITED STATES ATTORNEY
                              501 I Street, Suite 10-100
16                            Sacramento, California  95814
                              BY:  ANDRE ESPINOSA, AUSA
17                            BY:  KATHERINE LYDON, AUSA

18
    For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
19                            801 I Street, 3rd Floor
                              Sacramento, California  95814
20                            BY:  TIMOTHY ZINDE, AFD
                              BY:  SEAN RIORDAN, AFD
21

22

23  Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                  Official Court Reporter USDC, 916-446-6360
24                501 I Street, Room 4-200
                  Sacramento, California  95814
25
    TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1   SACRAMENTO, CALIFORNIA, THURSDAY, DECEMBER 14, 2017, 10:00 A.M.

2                              ---o0o---

3          THE CLERK:  Calling Case 16-24, United States versus

4   Helaman Hansen.  On for defendant's motion to dismiss Counts 17

5   and 18 and judgment and sentencing, Your Honor.

6          MR. ESPINOSA:  Good morning, Your Honor.  Andre

7   Espinosa and Kate Lydon for the United States.

8          THE COURT:  Good morning.

9          MR. ZINDEL:  Good morning, Your Honor.  Tim Zindel and

10   Sean Reardon from the Federal Defender's Office on behalf of

11   Mr. Hansen who is present.

12          THE COURT:  Thank you.  Good morning.

13      This is the time and place for pronouncement of judgment

14   and sentence.

15      On May 9th, 2017, this defendant was found guilty after a

16   jury trial of 12 counts of mail fraud in violation of 18 United

17   States Code Section 1341, three counts of wire fraud in

18   violation of 18 United States Code Section 1342, and two counts

19   of encouraging and inducing illegal immigration for private

20   financial gain in violation of 8 United States Code Section

21   1324(a)(1)(A)(i) and (B)(i).

22      The matter was referred to the probation office which has

23   prepared a presentence report dated November 22nd, 2017.

24      Counsel, have you all received and read a copy of that

25   report?

1              MS. LYDON:  We have.

2              MR. ZINDEL:  Yes, Your Honor.

3              THE COURT:  Thank you.

4        And counsel for Mr. Hansen, have you had a chance to

5    discuss that report with your client?

6              MR. ZINDEL:  Yes, Your Honor.

7              THE COURT:  Mr. Hansen, have you had a chance to

8    review that report?

9              THE DEFENDANT:  I did, Your Honor.

10             THE COURT:  All right.  You've had sufficient time to

11   discuss it with your attorneys; is that correct?

12             THE DEFENDANT:  That's right, Your Honor.

13             THE COURT:  All right.  And I will get to this in just

14   a minute, but just for the purposes of today, is there any

15   legal reason why judgment and sentencing should not proceed

16   today?

17             MS. LYDON:  No, Your Honor.

18             MR. ZINDEL:  No.

19             THE COURT:  All right.  There were objections to the

20   report.  I've reviewed that, but I'm going to adopt the

21   statements of material fact, sentencing classifications and

22   advisory ranges and policy statements set forth in the PSR and

23   determine them to be true and correct.

24        Now, I understand that there are some issues that we have

25   here that need to be dealt with, especially with Counts 17 and

1    18, I believe.

2         Before we get going -- so who's going to be arguing that

3    portion?

4              MR. ZINDEL:  I will give that to Mr. Riordan.

5              THE COURT:  Mr. Riordan.

6              MR. RIORDAN:  Good morning, Your Honor.

7         (Court Reporter requests counsel use the microphone.)

8              MR. RIORDAN:  Your Honor, I don't want to belabor any

9    of the points we made in our moving papers.  There have been a

10   number of filings by the parties on this issue, including

11   filings just yesterday, addressing discrete issues.  Unless the

12   court has any questions, I would submit based on the papers.

13             THE COURT:  Understood.

14        I have read those, and I do understand what the issues are

15   that are being raised here and the distinctions that we're

16   dealing with.

17        Government?

18             MR. ESPINOSA:  Your Honor, unless -- like Mr. Riordan,

19   the government acknowledges that there has been substantial

20   briefing in this case on the subject of the defendant's motion

21   to dismiss Counts 17 and 18.  The government is prepared to

22   submit on those papers unless the court has specific questions.

23             THE COURT:  But what's the -- from a practical

24   standpoint, what is this going to do?

25        If I grant the motion and dismiss Counts 17 and 18 as to

1    sentencing, what will that do here in this case?

2          MR. RIORDAN:  Your Honor, I don't believe that it

3    would have an effect on sentencing because of the way the

4    counts group, but Mr. Zindel can correct me if that's

5    incorrect.

6          MR. ZINDEL:  I think that's correct.  You wouldn't

7    enter judgment on those two counts.  The assessments would be

8    $200 less, 100 per count.

9          THE COURT:  Correct.  That's the bottom line.  Because

10    with everything being put concurrently, the sentence would be

11    the same.  It would just be two less counts.

12          MR. ZINDEL:  Right.  There are no levels added for

13    grouping in any event.  So if they were dismissed, it wouldn't

14    have any effect, no matter what the court determines the

15    guidelines to be.

16          THE COURT:  Government, what is your position on this?

17    I mean, that's the real bottom line.  On the other hand,

18    you're raising a potential appellate issue, which has not been

19    determined yet.  It might be.  It may not be.  Because there is

20    always -- if that particular decision by the circuit stays or

21    if it is going to be called en banc or what is going to happen

22    to it, I mean we're --

23          MR. ESPINOSA:  Your Honor, the government's

24    perspective is this:  While it is correct that dismissal of the

25    counts would not impact sentencing because the guideline

1    calculation is driven by the guidelines that apply to the mail

2    and wire fraud counts, the only way to dismiss the counts would

3    be to grant the defendant's motion and find that the statute is

4    unconstitutional, and it is not.

5         Because it is not unconstitutional, for the reasons set

6    forth in the United States' papers, including the fact that

7    this claim as a threshold matter is simply waived because it is

8    untimely, the court has no basis to dismiss Counts 17 and 18

9    and we ask the court not to do so.

10        There will inevitably be an appeal in this matter.  The

11   panel considering the Northern District case will reach its

12   conclusion about the statute.  Our position is that it is

13   constitutional.  That panel may reach the same conclusion or a

14   different one.

15        I note the Fourth Circuit has already considered this

16   argument six years ago, raised in a case there, and denied the

17   precise argument.  And because there is no basis to dismiss the

18   counts, the court shouldn't, even though the practical effect

19   is minimal or zero on the sentencing.

20             MR. RIORDAN:  Well, Your Honor, I would only point out

21   that not only is there a facial challenge before the court, but

22   there is an as applied challenge.

23        You know, Mr. Hansen has no party disputes, only encouraged

24   or induced these noncitizens to remain in the United States, if

25   at all, in a manner that was noncriminal in terms of what their

1    own actions were.

2         They overstayed their visas.  That is not a criminal issue.

3    Under the immigration laws, it is purely civil.  So just --

4    those are issues that the circuit may not get at in the case

5    that it is considering because those issues are somewhat unique

6    to this case and the facts before the court.

7         And of course, the encouraging criminal versus noncriminal

8    behavior distinction goes to the heart of our concerns about

9    the overbreadth of the statute.

10        If I encourage Mr. Zindel to do something that is not

11   criminal, then my conduct could not be criminalized,

12   constitutionally speaking.

13             THE COURT:  But as of this point there is no authority

14   to -- that justifies what you are saying.

15             MR. RIORDAN:  There is no Ninth Circuit case to

16   address this precise question.  But there is -- we believe

17   there is ample authority going back to when the Supreme Court

18   first drew -- carved out this exception under the First

19   Amendment for speech that is integral to criminal conduct.

20        In this case, the speech was not integral to criminal

21   conduct.  The speech was integral, if at all, to illegal

22   conduct, to a violation of noncriminal provisions of the

23   immigration law.

24             MR. ESPINOSA:  Your Honor, there is out-of-circuit

25   authority that directly refutes this precise claim that is

1  being made here.  In that Fourth Circuit case, which the

2  government cites in its brief, not only -- it is United States

3  v. Tracy, 456 Federal Appendix 267, Fourth Circuit, 2011.  It

4  is an unpublished case, but it is a case in which the defendant

5  challenges this statute, this Title 8, statute 1324(a)(1)(A)

6  (iv), on the same basis that it is constitutionally overbroad,

7  that it is vague, and makes the argument that the underlying

8  conduct isn't criminal, it is only a civil violation.  And the

9  court rejected all of those arguments and found that the

10  statute applied to civil conduct -- to the conduct at issue

11  there.

12        THE COURT:  But you have an unpublished case from the

13  Fourth Circuit, which means nothing here, correct?

14        MR. ESPINOSA:  It is not binding on this court.  That

15  is for sure.  But it is certainly some guidance in the face of

16  zero precedent from this court holding that the opposite

17  outcome is required.

18        THE COURT:  Well, it would seem to me the safest thing

19  to do is to go ahead and dismiss the charges and not have to

20  worry about them from an appellate standpoint.

21     On the other hand, as I have been known to do, sometimes it

22  is good to create new law and maybe this would be the perfect

23  time to have something like this go on appeal and see what the

24  Ninth Circuit does with it and we'll see what happens.

25        Motion to dismiss is denied.

1    We'll proceed.  Even though it is not going to make any

2    difference in the sentencing, but that's not the issue here.

3    And I think that right now this court has no authority that

4    says that's binding upon it that would say that this would be a

5    case where it should be.

6        In determining a sentence in a criminal case this court

7    looks to the guidance provided by the U.S. Supreme Court cases

8    of Booker and FanFan, as well as look at the advisory

9    sentencing guidelines and the statutory sentencing provisions

10   of 18 United States Code Section 3553(a).

11       The court understands that the sentencing guidelines are

12   advisory and not mandatory, but a starting point for the court

13   to consider in determining the sentence in a criminal case.

14   The court will look to the statutory provisions and determine a

15   sentence which is long enough to punish this defendant, deter

16   others from similar criminal conduct, but not be longer than

17   necessary to achieve the stated goal.

18       Defense, would you like to be heard, please?

19       MR. ZINDEL:  Yes.  Just in response to the

20   government's arguments, do you want to take these objections

21   one at a time or -- I'm going to only focus on the things that

22   effect the bottom line.

23       THE COURT:  Go ahead.

24       MR. ZINDEL:  All right.  So the first adjustment is

25   the adjustment -- the six-level adjustment for substantial

1    financial hardship to 25 or more persons.  And the government

2    identified the persons in their brief and sort of summarized

3    the various Victim Impact Statements.

4        Now, it is true that some of these people did check boxes

5    on a form using language from the guidelines, but this is a

6    six-level adjustment.  This has an effect.  We're agreeing

7    there should be a two-level adjustment.  Even the four-level

8    difference has a eight-year effect on this sentence, Your

9    Honor.

10       So this is something that the government would have to

11   prove happened, that 25 or more of the people who invested

12   money with Mr. Hansen in AHA suffered substantial financial

13   hardship.

14       And there are examples given in the guidelines.  And I was

15   able to count well under ten that I thought met that criteria.

16   I think I came up with six.  And there all we have are the bare

17   bone statements.  Most of the people say:  Yes, I lost money.

18   Nobody -- a few of them paid a little bit more than 10,000, but

19   most of these people paid less than $10,000.

20       So if you go through even the examples the government cited

21   in the brief, some of these people have been able to repay

22   their loans, some of the people have been able to -- did not

23   make the kind of substantial changes that constitute

24   substantial financial hardship.

25       I can give you some examples from the notes I made, but --

1  so for example, if you turn to page 8 of the government's

2  memorandum, the second example, which is supposed to be two

3  different people, all this person says is that he was required

4  to work extra hours.

5      The second example on page 9, this person says that I

6  just -- says she worked very hard for the money.

7      The next person says I have to repay the money.

8      And if you go through the examples, they're almost all the

9  same:  I still have to pay back the money I borrowed.  I have

10  to pay it back.  I had to work more hours.

11      Their statements do not confirm that they suffered the kind

12  of substantial financial hardship.

13      Now, I recognize that they're victims, and I recognize they

14  lost money.  And I agree that is tragic.  But this is a

15  particular provision of the guidelines that requires the

16  government to show, and because of the disproportional effect

17  show by clear and convincing evidence, that 25 or more suffered

18  substantial financial hardship.

19      They're far short of that number using the examples that

20  they cited.

21          THE COURT:  What do you consider to be "substantial"?

22          MR. ZINDEL:  A loss of a large amount of money.

23          THE COURT:  What is a large amount?

24          MR. ZINDEL:  You're not going to be able to retire.

25  You're not going to be able to go to college.  Not that you

1   have to look elsewhere for that money, or not that you lost

2   5,000 bucks or $4,500 or $7,000.  The things that mean you

3   substantially changed your life.

4       The word here is not financial hardship.  All of these

5   people suffered financial hardship.  These are not people of

6   means.  But the keyword is "substantial."  This has to be

7   something unusual.

8           THE COURT:  That's what I'm trying to get to.

9   Substantial -- personally, if I lost $1,000, I would think

10  that's substantial.  If I lost 5,000, that is very substantial.

11      And I'm trying to understand what you believe the word

12  "substantial" means when it comes to a "substantial hardship."

13          MR. ZINDEL:  It is right in the guidelines.  It is

14  Note 4F to 2B1.1:

15      (Reading:)

16      Becoming insolvent and filing for bankruptcy; suffering

17  substantial loss of retirement, education or other savings or

18  investment fund; making substantial changes to employment, such

19  as postponing retirement plans; making substantial changes to

20  living arrangements, such as relocating to a less expensive

21  home.

22      (Reading concluded.)

23      Now, some people say we moved, but they didn't say we moved

24  to a less expensive place.

25      And suffering substantial harm to ability to obtain credit,

1   most of these people are not people who are applying for credit

2   to begin with.

3        So you know, I know what you are saying.  I'm fighting with

4   an agency over $70 right now, and it is really pissing me off

5   and I would love to get vengeance on them, but this is where

6   basically the actions of the defendant wiped somebody out.

7   That's what substantial financial hardship is.

8        I appreciate all of these people suffered hard blows.  I'm

9   sorry about that.  But I just don't think it meets the criteria

10  under the guidelines.  I agree there should be a two-level

11  adjustment.  There should not be a six-level adjustment.

12              THE COURT:  Government?

13              MS. LYDON:  Your Honor, this fraud in its design was

14  designed to wreak substantial financial hardship on a

15  population of victims who are not people of ample means.

16       Your Honor sat through the trial.  You heard these

17  witnesses testify.  These are home health care aides.  These

18  are line cooks.  These are hardworking people, earning low

19  wages.  And in exchange for their life's dream of becoming a

20  United States citizen, the defendant took from each of them up

21  to $10,000.

22       From the stand they described how that impacted their

23  lives.  And in the nearly 50 Victim Impact Statements

24  submitted, they described the substantial financial harm that

25  the defendant's fraud wrought upon them.

1      And the harms they disclosed in those Victim Impact

2    Statements are exactly those which the sentencing guidelines

3    point out constitute substantial financial harm.

4      They checked boxes indicating they became insolvent, they

5    had suffered substantial financial loss of their savings,

6    savings that they had been accumulating for retirement, for

7    their children's educations.

8      Those who did not have savings took out loans, and many

9    victims described that the loans had been very difficult to

10   repay or been unable to be repaid.

11     Victims described that the loans were at high interest

12   rates.  They also described how they had changed their living

13   arrangements because of the defendant's fraud.

14     Now, what boxes are checked in a Victim Impact Statement

15   does not control, but because the defense raised an issue

16   about, in their view, fewer than 25 had checked boxes

17   indicating that they had suffered the specific six financial

18   harms pointed out in the application note to the guidelines,

19   the government tabulated a chart -- two charts.

20     The first describes -- or includes only those victims who

21   had checked the boxes on the Victim Impact Statements

22   indicating they suffered those six specified harms.  That chart

23   amounted to 28 victims.  And the government went further

24   because many of the victims who did not check the boxes

25   suffered exactly the same types of harm.  And we described in

1   the chart from the government's responses to the defense

2   objections on pages 13 and 14 additional victims.  That amounts

3   to 40 victims.

4       And those just encompass the defendant -- the victims who

5   submitted Victim Impact Statements or testified at trial, which

6   is nowhere near the entire universe of the defendant's

7   victims.

8       Evidence was introduced at trial indicating the defendant

9   took in 1.8 million in revenue in the course of the fraud.  And

10  a spreadsheet uncovered in the search warrant included 471

11  victims of the immigration program.  There are more than 25

12  victims who suffered substantial financial harm as a result of

13  defendant's fraud, and Your Honor should so find by clear and

14  convincing evidence.

15          THE COURT:  All right.  I think I've heard enough on

16  this particular issue.  Are there people that wish to be heard

17  today?  Any victims?

18          MS. LYDON:  There are victims in the courtroom.  I

19  have not had a chance to speak to them.

20          THE COURT:  I wasn't sure.  I think I heard there may

21  be.  Would you let me know?

22          MS. LYDON:  Yes, Your Honor, if you can give me a

23  moment.

24      (Counsel checks with victims.)

25          MR. ESPINOSA:  Your Honor, I don't know when the court

1   thinks it may be appropriate to hear from the victims, but

2   there are three who have indicated a desire to speak today.

3   There are others in the courtroom today who have deferred that

4   option to the victims who do choose to speak.

5          THE COURT:  Well, this is the judgment and sentencing

6   hearing, so if we're going to hear anyone speak, this is the

7   time to do it.

8      Is there going to be a need for interpreting at this time?

9          MR. ESPINOSA:  I believe so, Your Honor.  We've asked

10  an interpreter be present, and I believe there is one present.

11  And there are headsets available for the victims.

12         THE COURT:  All right.  Let's go ahead and start then.

13     For the record, the interpreter?

14         THE INTERPRETER:  Lisa Esquivel, Certified Spanish

15  Interpreter, previously sworn.

16         THE COURT:  Thank you.  The first person speaking is?

17         VICTIM SPEAKER MS. VALVERDE:  Ramona Valverde.

18         THE COURT:  All right.  Go ahead.

19         VICTIM SPEAKER MS. VALVERDE:  I feel hurt.  I feel

20  that I have been duped.  It was money that we worked very hard

21  to gather.  It was money that we had been saving so that my

22  youngest son could go to college.  And I feel that I was -- I

23  was mocked and I was duped because it took a lot of work for us

24  to gather that money together.

25     That's all.

```
 1              THE COURT:   Thank you.
 2         Next victim.
 3              VICTIM SPEAKER MS. HERNANDEZ:   My name is Gabriela
 4    Hernandez.
 5         Finally, after two years ago, I want to see him, his face.
 6         Can I talk to him?
 7         I don't know if you remember me.
 8         When you say the judge, they don't know the law, they don't
 9    know what is going on with this case, when we had the reunion,
10    the last reunion with him, because he say everything is true,
11    believe me, the judge, they don't know nothing.
12         And I know.   Finally after two years, judge, we know.   The
13    judge, they know the law.
14         I pray for you.
15         Finally, I don't want you here, honestly.   Everything
16    changed in my life.   I feel nothing happened.   You know, he's
17    not only changed my life, he changed my kids' life, by
18    believing him.
19         What he say, when he laugh, it's not only the money, Judge,
20    it is my life, my kids' life.
21         I come to this United States to change everything for them,
22    and for me, of course.   But he liar, everything he say.   It is
23    not only me.   It is many people.
24         And now I know he can't do what he need to do.   Return my
25    money.   But God, he is the best.
```

1      Thank you, Your Honor.

2              VICTIM SPEAKER MS. NAILATI:  Good morning, Your Honor.

3      My name is Vasiti Nailati.

4              THE COURT:  Would you spell your name just to make

5      sure we get it.

6              VICTIM SPEAKER NAILATI:  Vasiti is spelled

7      V-a-s-i-t-i.  Nailati is spelled N-a-i-l-a-t-i.

8              THE COURT:  Thank you.

9              VICTIM SPEAKER MS. NAILATI:  Thank you.

10     Your Honor, I would like to, this morning, say that I'm

11     happy that this day has come.  I've been asking about this

12     sentencing date, and it was -- it kept moving.  I drove from

13     Sausalito this morning, just to be here this morning, to be

14     able to hope to say what I have to say.

15     I have wronged a lot of Fijians.  I am from Fiji.  I was

16     instrumental in talking to a lot of Fijians about the adult

17     adoption.  And a lot of people came to know about it because

18     they came through and asked me to a point now that they think

19     that I was working in conjunction with Mr. Helaman, that I knew

20     what was going on.

21     And to this day I am still not able to go out and meet with

22     my fellow people just because this project of his has really

23     shamed and humiliated me.  And not only me, but everybody else.

24     We have spent money.  I would organize meetings, and I

25     would call up people personally to come to the meetings.

1   Through us, Mr. Helaman has made connection to my people in

2   Fiji, to try and organize some kind of a business deal.  And he

3   knows about it.

4       And what I'm trying to say here is I am grateful to the

5   court system for trying to mete out the correct and most

6   rewarding charges that is going to be given to Mr. Helaman

7   simply because of his promises.

8       His promises -- I'm lost for words to even describe that.

9   He has promised everybody.  Looked me in the eye.  I would

10  attend meetings with him almost every week, and he kept giving

11  assurances, even though people started saying that something is

12  wrong with what is going on.

13      But Your Honor, can I address Mr. Helaman?

14      Mr. Helaman, I am so ashamed that I have come to -- despite

15  everything that I have been told, that I have believed you

16  without even asking.  Because you kept on assuring us that the

17  lawyers didn't know anything, that what the lawyers said were

18  incorrect, immigration lawyers and all other lawyers.

19      And so I am ashamed that I believed them because of how you

20  were able to persuade us in everything that you said, in the

21  papers that you prepared.

22      And for that I want to say that I want to -- that I feel

23  sorry for everything that has happened, but at the same time

24  the law must travel its course.

25      Thank you, Your Honor.

1          VICTIM SPEAKER MR. MADRANO:   Good morning.   My name is

2    Reyes Madrano.

3       I just wanted it to be known it wasn't just the financial

4    loss, but also how the lies and promises of this man, Hansen,

5    affected the emotional stability of our family, my children's

6    emotional stability, especially the youngest.

7       The videos that this man -- the threats this man made in

8    the videos he posted on the Internet scared my youngest son

9    very much.   So much so that he didn't even want to leave the

10   house.   He didn't want to go to school.   He was afraid that we

11   would be separated because of the lies that this man said and

12   promised.

13      I don't wish him or his family anything bad, but I do

14   believe in the justice system of this country.   But he must

15   know that while our families were suffering because of his lies

16   and promises, he was enjoying all the money he was bringing in.

17      And he has to understand that he affected the lives of many

18   families.   To this day my son, the youngest one, is still

19   affected just knowing we're here.   But even though my son

20   doesn't actually know Mr. Hansen, he's just afraid just hearing

21   his name.

22      I don't know if to him this is something insignificant,

23   something without consequences, but all his program, with all

24   his lies, affected our families.

25      I thank God that finally justice was served, and I hope

1    that one day he recognizes his error.

2        Thank you.

3            THE COURT:  All right.  Anyone else for the

4    government?

5            MS. LYDON:  I don't believe any other victims wish to

6    speak.

7            THE COURT:  All right.  Thank you.

8        Do you wish to be heard on this issue, the objections that

9    have been made?

10           MS. LYDON:  I believe the only one that's been argued

11   by Mr. Zindel so far is the vulnerable victims -- I'm sorry --

12   the substantial harm to 25 or more victims.  I don't have

13   anything further on that particular objection.

14           THE COURT:  All right.  Mr. Zindel, anything else?

15           MR. ZINDEL:  Your Honor, I'll just briefly respond to

16   the government's opposition to our -- there are five remaining

17   objections.

18       The first is to sophisticated means.

19       The guidelines define that as conduct that is especially

20   complex or especially intricate pertaining to the execution or

21   concealment of an offense.

22       The cases on this adjustment all talk primarily about

23   concealment.  It is when you use sophisticated means to avoid

24   detection.  And this particular fraud was, without a doubt, the

25   most out-in-the-open fraud that I have ever seen as an

1    attorney.

2        Mr. Hansen was on YouTube using his name, Helaman Hansen.

3    Mr. Hansen made -- other people knew him as Helaman Hansen.

4    These four persons who have just spoken eloquently to you today

5    all knew him as Helaman Hansen.

6        This is not a sophisticated scheme.  This was a

7    fundamentally wrongheaded scheme.  The means that the

8    government argues were sophisticated were the things that he

9    said he would do:  I'll take you to be adopted by an American

10   family and you'll follow these steps and become a citizen.

11       They're not sophisticated.  They're foolish.  Sophisticated

12   means is an adjustment that is designed to punish somebody who

13   is really exceptionally clever at cheating people and then at

14   hiding it.  That's not what happened in this case.

15       So that's my answer to that, my response to the

16   government's proffer regarding sophisticated means.

17       Should we ask the government to respond or go to the next

18   one?

19           THE COURT:  I'll just say right now I don't need the

20   government to respond.

21       I don't believe that simply having to hide it or somehow

22   obscure it makes it more sophisticated.  The fact of the matter

23   is Mr. Hansen utilized -- which I consider to be somewhat

24   sophisticated -- YouTube, the Internet, and did a lot of things

25   that a general person who is trying to create fraud would not

1    necessarily do or know how to do it.

2        I believe -- and I find by clear and convincing evidence

3    that the scheme that Mr. Hansen developed and how he promoted

4    it was, in fact, sophisticated.  So the motion is denied with

5    respect to that issue.

6        Next.

7            MR. ZINDEL:  The next one is the vulnerable victim

8    adjustment.  Again, this was a scheme -- first of all, I just

9    noted the irony about the number of times the government in its

10   various filings uses the word "vulnerable."  This is the same

11   government that comes here frequently to prosecute people for

12   being undocumented aliens or uses that as an aggravating factor

13   when they've committed an offense.

14       But the tables have turned here, and those are the victims

15   of the offense, they are all undocumented aliens.  But this is

16   an offense that existed only for that reason, and I think that

17   that is a matter subsumed in the base offense level.

18       On that I'll submit it, Your Honor.

19           THE COURT:  And here's another situation where, when

20   you go through a trial, and you get to see and hear the victims

21   and see what's happened, it is completely different than if it

22   is just a guilty plea.

23       And again, I am not saying that because the person

24   exercised their constitutional right to go to trial that

25   they're going to be penalized for that.  It is just that when a

1    court has the opportunity to view the videos, see the people

2    sitting in the witness chair no more than six feet away from

3    me, and you understand and you feel the hurt and what they went

4    through, it is a different situation.

5        I consider all of these people that testified in this

6    particular case and who were harmed in this particular case to

7    be vulnerable victims.  They were trying to get to a point to

8    have citizenship, and that meant the world to them.

9        How much more can you get to for a person to be vulnerable?

10       So again, I'm rejecting the defense argument that these

11   people were not vulnerable in how they were treated.  That

12   motion is denied.

13       Next.

14           MR. ZINDEL:  Organizer/leader adjustment.  This

15   adjustment requires proof of other participants who are

16   criminally culpable.  And again, it is the government's burden.

17   They have put on no evidence.  They made some argument about

18   it, but they put on no evidence that others were criminally

19   culpable.

20       They point out that Mr. Sevier, who counseled victims to

21   use false addresses, they believe that he may have known, but

22   they didn't charge him.  They didn't even, I guess, have

23   probable cause enough to take that to a grand jury.  So they

24   can't argue now that by clear and convincing evidence that he

25   was a criminal participant in the offense.

1    And the other significant fact about him is that the

2 testimony at trial, when that was brought to Mr. Hansen's

3 attention, that Mr. Sevier was taking people and using the

4 false addresses, he fired Mr. Sevier.

5    So I think that this is not a case -- this is a one

6 defendant case and nothing can change that fact.  This is not a

7 role adjustment case.

8         THE COURT:  Response.

9         MS. LYDON:  The guidelines are clear that to be a

10 participant under the guideline the individual need be

11 criminally culpable, but need not be criminally convicted.

12    The government's decision to charge only Mr. Hansen with

13 crimes that must be proved beyond a reasonable doubt and were,

14 does not, by any means, amount to a concession that no one else

15 was culpable.

16    To the contrary, the evidence that Your Honor saw at trial

17 indicates that at least three other individuals, Viola Hansen,

18 the defendant's wife, Newalow Weekes and Jeffrey Sevier, most

19 likely were, themselves, criminally culpable in the fraud that

20 they helped to perpetuate.

21    With respect to Mr. Sevier, it is somewhat ironic that

22 having taken the tack at trial of making it appear as though

23 Mr. Sevier was really the one who duped certain of the victims,

24 the defense now argues he's not culpable.

25    In fact, both he and Mr. Newalow Weekes acted threateningly

1    to victims who had started to suspect the fraud.  They scared

2    them to the extent that one of the victims who testified tried

3    to file a police report after Newalow Weekes threatened her.

4        That is not -- those are not the actions of individuals who

5    honestly but mistakenly believe that the organization in which

6    they're involved is legitimate.

7        With respect to Viola Hansen, the defendant's wife, she

8    made representations that she had been adopted and obtained her

9    citizenship that way.  And her documents were displayed

10    throughout the office as an example of someone who obtained

11    citizenship through adult adoption.

12        In reality, Viola Hansen, as she well knew, obtained her

13    citizenship through a DV2 Visa because she was the spouse of

14    the defendant who received a DV1 Visa, a Diversity Visa, and

15    then she was able to naturalize as a United States' citizen

16    after having five years of legal, permanent resident status.

17        Your Honor should find that those three individuals, or any

18    of those individuals would suffice, are criminal participants

19    which supports this enhancement.

20        In addition, the enhancement requires that the defendant's

21    criminal activity be otherwise extensive.  It was undoubtedly

22    extensive.  It mentioned that there were at least 471 victims,

23    it spans several states, he had a network of agents, he had two

24    brick and mortar establishments, and he utilized the IRS, the

25    California courts and the California Department of Health.

1    This was otherwise extensive criminal activity in which the

2    defendant acted as the leader and organizer.

3              THE COURT:  Thank you.

4        The court is going to find that there was extensive

5    activity, and the motion on this issue is denied as well.

6        Mr. Zindel, your next motion.

7              MR. ZINDEL:  The next one, Your Honor, is the biggest

8    stretch of all, which is that somehow the government believes

9    that Mr. Hansen occupied a position of trust as to these

10   victims.

11       A position of trust is when I'm your accountant and you

12   give me your money and you say -- or I'm your investment

13   advisor and you give me your money to invest for you, and I

14   pocket it.  You have trusted me with discretionary judgment

15   over your money.  You have entrusted that to me.

16       Two things happen when you do that.  It makes it easier for

17   me to squander your money, and it makes it easier for me to

18   hide what I'm doing.  That is what a position of trust is.  It

19   is a particular legal term.

20       Mr. Hansen ran a service.  Not a trust.  You join my

21   membership organization, and we will arrange for you to be

22   adopted.  Follow all these other steps, then you'll become a

23   citizen.  It is a service relationship.  Not a trust

24   relationship.  So that adjustment clearly does not apply here.

25             THE COURT:  Government.

1    MS. LYDON:  The guidelines make clear that -- or the

2    Ninth Circuit has explained that by the test's plain element,

3    an element of discretion is the decisive factor in the

4    enhancement.

5    Here Mr. Hansen certainly occupied a position of private

6    trust because he was the one who made all of the calls.  The

7    victims -- you just heard victims allocute that they trusted

8    him.  They trusted his representations.

9    He assured them that he knew better than the lawyers.  He

10   told them he had been trained in immigration law, that he had a

11   PhD.  He crafted an aura of authority and gave the impression

12   and stated that he had knowledge in areas that should make the

13   victims put their trust in him.  And they did, to their

14   detriment.

15   THE COURT:  I believe that the individuals who were

16   caught up in this scheme were very vulnerable, and they were

17   trying to do their very best to become citizens of the United

18   States.

19   And that's a very personal issue.  And I think once you

20   have been through a number of citizenship -- not performances,

21   but issues, where you have sworn in United States' citizens,

22   like I have, you realize it is a very personal, personal issue,

23   and people give everything that they possibly have to get to

24   that point.

25   And I believe that that does, in fact, make them

1    vulnerable.  It is something that they truly want more than

2    anything.  And until -- if you haven't -- until you have

3    actually been a part of those ceremonies and done this, you

4    don't understand.

5         And I believe that every one of these people who are

6    victims, who were trying their very best to become a United

7    States citizen, they were, as the one victim said today, we

8    were duped.  Period.  And that's a horrible thing to have

9    happen.  So I'm rejecting the last motion and finding it to be

10   not well-taken by this court.

11        Mr. Zindel, do you have any other motions?

12             MR. ZINDEL:  Yes, Your Honor.  Your ruling on that

13   simply conflates the vulnerable victim adjustment which you

14   ruled on a moment ago with a position of trust.  And so if

15   that's the court's ruling, that's the court's ruling.  But I

16   think that the problem here is what we're missing is evidence

17   that Mr. Hansen occupied a position of trust.

18             THE COURT:  Well, once again, I can look at it and say

19   that I heard the testimony, I watched the victims, I watched

20   the evidence being brought into this court, and that's one of

21   the situations that happens when you go to a jury trial, the

22   court gets to hear everything and see the people who are

23   involved.

24        And while I understand your position, Mr. Zindel, I'm not

25   going to go along with that, and I reject that position.

1          MR. ZINDEL:  Your Honor, our last objection has to do

2    with the obstruction of justice adjustment.

3       And I understand that Mr. Hansen said things at trial that

4    were fabulous and fanciful and impossible, but I don't really

5    think that that's what the extra punishment for obstruction of

6    justice has in mind.

7       He's not going to be getting credit for acceptance of

8    responsibility.  Obviously, that's a three point spread, which

9    makes a difference of several years, but obstruction of justice

10   is when somebody comes in here and really they've got an evil

11   mind.  They think they are going to fool people and cheat

12   people.

13      And Mr. Hansen's beliefs are solidly wrong.  I've had that

14   discussion with him hundreds of times since I was appointed to

15   represent him.  But I think that he clings to them because they

16   mean something to him.  He's not trying to cheat people.  He's

17   not trying to obstruct justice.

18      I would ask the court, if the court were to apply that

19   adjustment, to vary it, to vary from it and eliminate its

20   effect on the sentence.  And on that I'll submit it, Your

21   Honor.

22          THE COURT:  It is interesting.  Mr. Hansen, I do

23   believe, he truly believes what he was saying.

24      It is very clear to this court, after watching him and

25   listening to him and seeing what he said in trial, that he

1    truly believed it, even though it was incredibly wrong, against

2    the law and any other terms that you can come up with.

3        He did believe it.

4        Is that obstruction of justice, a person just wrongfully

5    believes in something that is against the law?

6            MS. LYDON:  Your Honor, Mr. Hansen is extremely

7    convincing and perhaps at times he can convince himself, but

8    the notion that he did not know that the statements he was

9    making were false when he made them is belied by the jury

10   verdict.

11       Perhaps at times he can get himself worked up, as Your

12   Honor may have been observing, but an element of wire and mail

13   fraud is the defendant made false statements knowingly.  And

14   the jury found beyond a reasonable doubt that he, in fact, was

15   lying.

16       And he took the stand and attempted to convince the jury

17   that he believed it, and that those statements were true.  And

18   he failed.

19       And that is -- defendants commonly take the stand and make

20   their situation worse, which Mr. Hansen did, but that does

21   not -- that is entirely consistent with the application of the

22   obstruction of justice enhancement.

23       What it requires is that the defendant willfully attempted

24   to obstruct or impede administration of justice.  He did so in

25   two ways in this case.

1      First, he did so by perjuring himself during jury trial on

2   a material matter and with the willful intent of trying to

3   convince the jury that he had made people citizens through

4   adult adoption.  You saw him do that twice.

5      He took the stand on two separate days.  And he first

6   testified that people had become citizens through adult

7   adoption and his program through AHA.  And when he sensed that

8   that had not worked out as well as he would have hoped, he

9   insisted on taking the stand and insisted on cross-examination

10   that he had, in fact, made a woman a citizen through adult

11   adoption but could not remember her name.

12      Then he insisted that he had been making people citizens

13   through adult adoption for years prior to founding AHA, and

14   that was the basis, the distinguishing factor that one with AHA

15   and one hadn't was the explanation for his admission to the FBI

16   that he knew the program had never worked.

17      This is not a defendant who believes in the truth of what

18   he's saying.  This is a defendant who is floundering about,

19   trying new and different lies to explain his previous lies.

20      He tells his lies in a calibrated fashion.  He tells

21   whoever he's speaking to just enough that they'll go away or to

22   get them past the point that they can fact check him.

23      He told the victims that he couldn't show them filings of

24   previously successful adoptees because they were confidential

25   and protected by law.  But when the FBI arrived with a search

1     warrant, he knew that lie wouldn't work with them, so he told

2     the FBI that he had destroyed them.

3         This is a defendant who changes his lies depending on his

4     audience.  It is not deluded.  It is shrewd.

5         (Government counsel confer.)

6         That's a good point.  Mr. Espinosa just pointed out that he

7     insisted that he had been making -- sorry -- making victims

8     citizens through the I-130 process, when in reality he

9     submitted I-130 applications, and those had uniformly been

10    rejected by USCIS.

11        He, in fact, himself had gone through the citizenship

12    process.  He used the I-130 forms.  He used the I-130 forms for

13    his wife.  He claims that she had become a citizen through

14    adult adoption.  When he filled out the forms, he knew well

15    that she had obtained her citizenship through other means.

16        This is a defendant who lied willfully and knowingly on the

17    stand, even if he managed to give off the impression that he

18    believed it at certain times.  The jury rejected it.  The jury

19    found that he had made false statements knowingly and willfully

20    and returned verdicts of guilty on the false statement -- or on

21    wire fraud and mail fraud counts.

22        Separately, the defendant obstructed justice in this

23    proceeding by threatening victims in an effort to keep them

24    from going to law enforcement and from testifying in this case.

25        Your Honor saw in evidence the video that victims testified

1    about today, the YouTube video, in which he stated that he was

2    working with Immigration and Customs Enforcement.  And that if

3    they didn't come to his meeting on January 30th, after the

4    search warrant had been executed, that that must mean they did

5    not want to be in the country, and that he would have no choice

6    but to report their names to ICE.

7         That terrified victims.  Certain victims stated in their

8    Victim Impact Statements that it, in fact, succeeded in

9    preventing them from coming forward.  Excerpts of how the

10   defendant's threats of deportation affected victims are listed

11   on page 28 of the government's objections.

12        He clearly used those threats to prevent victims from

13   reporting his false scheme.  And it was through those threats,

14   in part; that enabled his scheme to continue for as long as it

15   did.

16        He also sent emails to victims in violation of the

17   condition of release that he have no contact with victims,

18   listing victims who testified at trial by name on a list of

19   troublemakers, and those are attached as exhibits to the

20   government's objection.

21        So the defendant obstructed justice in at least two ways.

22   We ask that you find both of them support the obstruction

23   enhancement, his perjury and his threatening actions and words

24   towards victims.

25        With respect to the perjury enhancement we ask that the

1     court expressly find that Hansen, one, gave false testimony,

2     two, on a material matter, and third, with willful intent.

3           THE COURT:  All right.  The court will overrule the

4     objection as to the obstruction of justice issue.

5        The court is going to find the base offense level in this

6     case was 7, there was a loss amount of between 550,000 and 1.5.

7     There will be a 14 level enhancement.  The court will find that

8     there is a victim impact of plus 6, that there has been over 25

9     who suffered substantial hardship which was shown by clear and

10    convincing evidence during the course of the jury trial.

11       The court finds the sophisticated means, plus two;

12    vulnerable victims, plus two; leadership role, plus two; abuse

13    of a position of trust, plus two; obstruction of justice, plus

14    two.  The court will not find that there was a charitable

15    organization.

16          MS. LYDON:  Your Honor, I don't believe that's been --

17    the government objections have been argued.  May I be heard on

18    that?

19          THE COURT:  You can go ahead, but -- go ahead.

20          MS. LYDON:  Okay.  The charitable enhancements and

21    representations that the defendant was acting on behalf of a

22    government agency are well supported in the record.

23       While the defendant implies that the standard requires that

24    the government prove that the victims were in some way

25    contributing to charity, that is simply inconsistent with the

1    cases.

2        The cases clearly hold that the defendant -- or the

3    government need not prove that the victims were not acting for

4    their own financial gain.  The victims could be acting for

5    motivations, as they were in this case, like their desire to

6    become citizens.  But the defendant's representation that he

7    was acting on behalf of a charity made them more likely to

8    trust him.

9        That's exactly what happened in this case.  And separately,

10   the defendant falsely stated that he was working with

11   government officials and that supports the enhancement.

12       The United States quoted in its papers a block quote about

13   a defendant who had implied he had connections to the Mexican

14   government, and that was false.  And that made his victims more

15   likely to trust him.

16       Here the defendant trotted USCIS officials through his

17   place of business on a tour after having summoned victims to

18   watch them walk through so that they would believe that he was

19   working with government officials and be more likely to believe

20   and continue to believe his program was legitimate.

21       That undermines trust in government, and that's exactly the

22   sort of behavior that supports the enhancement.

23           THE COURT:  All right.  Anything?

24           MR. ZINDEL:  No, Your Honor.  It doesn't apply.

25           THE COURT:  I don't find that it does, and I'm going

1   to not add the plus two for a charitable organization

2   enhancement.

3          MS. LYDON:  All right.  May we also clarify your

4   ruling on the position of trust briefly?

5      What I understood you to be describing was that the victims

6   put their trust in him at his urging, that they should believe

7   his interpretation of the law, that they should not trust

8   lawyers, they should trust him as an expert in immigration law

9   with a PhD, and because they did so the enhancement applies.

10     Does that support Your Honor's ruling of the defendant's

11   abuse of position of private trust?

12          THE COURT:  Yes.

13          MS. LYDON:  Thank you.

14     And is Your Honor finding -- making the findings that the

15   government requested with respect to the obstruction charge,

16   that --

17          THE COURT:  Yes.  I was trying to make that clear,

18   yes.

19     The court, in essence, is going to agree with the probation

20   officer's report and find there's a total offense level, after

21   everything I stated, of 37, a criminal history category of

22   Roman I, which has a guideline range of 210 to 262 months of

23   imprisonment.

24     I believe that the maximum sentence in this case will be

25   240 months by statute at any rate, and that would be as to

1   Counts 1 through 9 and 11 through 16.

2       And there's a restitution recommendation by the probation

3   officer of $576,264.22 and a special assessment of $1,700

4   because there was a dismissal of Count 10 during the course of

5   the trial.  So that's $100 per the 17 counts.

6       Mr. Hansen, you have the right to say something at this

7   point in time.  This is called your right of allocution.

8       Do you have anything that you wish to say at this point?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Go ahead.

11          THE DEFENDANT:  I would like you to give me enough

12  time to present myself to you, if I may, 10, 15 minutes at

13  least.

14          THE COURT:  I don't know.  We'll see where you go.

15  Start.  Go ahead.

16          THE DEFENDANT:  Okay.  Your Honor, thank you for the

17  opportunity to speak to you this morning, and also, as you have

18  heard all these things, I don't want talk about it.  That's the

19  assumption that I have seen, and believe it or not, that's not

20  my case here.

21      What I believe in my heart today is standing on behalf of

22  my company, Americans Helping America Chamber of Commerce, as

23  the chairman and a founder of that.  And we have -- we have

24  daily worked many, many years in this apart from what is

25  happening today.

1      My view you to, Your Honor, that we did everything

2  diligently in the way we looked at things that was supposed to

3  be, that is according to the law.

4      I haven't even tried to address it in any other way.  I

5  said the law and the law and the law, the United States law,

6  the Sovereign State law, the United Nation law, even the

7  Federal law.  But my point I'm trying to make here, Your Honor,

8  is that we believe in what is going on.  And the law is there.

9  I'm not trying to quote something that is not in the law

10  itself.

11      Let me give you my scenario of what I feel about this whole

12  thing.  In the --

13      (Court Reporter requests the defendant repeat his

14      statement.)

15          THE COURT:  In the what?  What did you say?

16          THE DEFENDANT:  In the Adjudicator Act of 1873, when

17  there is a conflict in the letter of the law, we cannot be

18  blamed or guilty if the substance and spirit of the law is not

19  there.  The law must be there.  And the spirit of the law and

20  the substance of the law must be there in order for us to feel

21  not guilty.  We look at every aspects of these things.

22      If I follow the order of the United Nation, it is a law all

23  over the United States, all over the world, every country,

24  about adult adoption.  When a person is adopted in any country

25  by a court of that country, by a judge of that country, it's

1    the same thing as a law for the sibling.  That's a law of

2    substance and in spirit.

3        Then we come to the Federal law.  I am just talking about

4    our understanding, Your Honor.  If it doesn't fit into it, I am

5    sorry, but this is how we look at the whole thing.  It was not

6    by force or doing anything unlawful.

7        The Federal law at 203(c) of the INA Act, that law it says

8    the adult adoption process by a United States citizen.  And

9    that's where the I-130 came from.  The I-130 is a process of

10   that duly instruction.  So four different statements are there.

11       First is for the spouse, which is an adult.  And anybody

12   who is over -- an adoptee over the age of 21 is an adult.  And

13   then anybody under the age of 21 is an adult and a minor.  And

14   then it goes into a sibling of a husband and wife of any age.

15       The law, the substance, the spirit was there.  That's how

16   we understand.

17       Then we go into state law as we searched for answer to all

18   our help that we want to do in the community.  There is an

19   adoption law, which is a minor adoption --

20       (Court Reporter requests defendant to repeat the

21       statement.)

22            THE DEFENDANT:  -- which is a minor adoption, and the

23   Hague Convention, H-a-g-u-e, and also the adult adoption.

24   Those three are binding to the local ordinances of the

25   government and the state.  And the state confirm and confer

1   those citizenship to the rights of that according to the

2   citizens of the United States with their constitutional rights.

3   It is a law for offspring of a citizen.

4       We know from that that -- I mean, I just want to refer back

5   to the -- to the Congress, 90th Congress, first session, on the

6   voting of 113 of part 12 of June 13, 1967.

7       It says there:

8       Let there be the citizen of America to exercise their own

9   judgment, which means to form a fundamental law in which he is

10  to live.  That work is his work and cannot properly be taken

11  off him.

12      Your Honor, that is a true fact of statement.  It was

13  written in the house of Congress.

14      This reminds us of the Constitution of the United States

15  that we, as the people, in order to form a more perfect union,

16  establish judges and ensure the domestic tranquility.

17      Those elements, we look at it ourselves as a community, to

18  find our saga is fair and square according to the law.  So you

19  can see that we did not do anything away from the law, but we

20  do as we describe the law, interpret the law, and try to work

21  out a solution to help.

22      That's all we did.  It was not any other reason or any

23  other way.

24      We failed.  We know.  That is how it is.

25      And then we look into the United Nations law -- I mean, the

1  United States law under the adoption -- I'm sorry -- I'm sorry,

2  Your Honor -- under the United States of the citizen.  And we

3  look at it, at Part 2 of the United States citizenship, the

4  interpretation of that.  There is a citizen in the federal and

5  there is a citizen in the state.  And they both confer or

6  granted by the sovereign state, as we understand it.

7       Those things came to us.  And with that -- sorry, Your

8  Honor.  I have run out of breath a little, but I just wanted to

9  catch up as much as I can to you.

10       With that, the citizen of the state is a born citizen.  And

11  the adoption ordinances in the local government is attached to

12  those.  Ted Cruz, Obama, they're all part of that.  And all the

13  civil servants in the United States, they have their children

14  born overseas, they all part of that, become a United States

15  citizen, born citizen with that category.

16       I am telling you we haven't instigated or fabricated

17  anything to anyone, but just interpreting the law by itself.

18       With that we know it is happening to us.  In Part 3 we all

19  know that the federal government cannot grant or secure

20  citizenship under its jurisdiction and under its power.  That

21  is the United States' interpretation of that power.

22       With that, Your Honor, I know.  And if that's not under the

23  jurisdiction of the federal, it will fall under the protection

24  of the state.

25       What are the protections of the state?

1    It is a development process, not just being In there.

2    George W. Bush, Obama, Clinton, they all talk about the

3    five-step process for the undocumented illegal aliens to become

4    a U.S. citizen.  It comes from that development process of the

5    state.

6    And the state had its own contribution to it with the

7    California trust to stipulate the federal government from

8    entering into the state so that people can be protected due to

9    the process.  Now they have the SB-54, and now the whole state

10   is protected.

11   There must be a way to process something if there is a room

12   and a space and freedom for the people.  Because the citizens

13   are the one who is doing the adoption, of bringing those people

14   into the country.  It is not that they adopt the people, we are

15   instigating those.  It's got to do with the citizen.

16   Your Honor, I'm just trying to tell you the whole thing

17   here is affecting me, but I wish that you can be able to just

18   bear with me a little bit.

19   (Court Reporter requests defendant repeat the statement.)

20   The disadvantage and the unfair due process of this case

21   has caused me a great deal of stress and very, very unfair to

22   me.

23   When we invited the Homeland Security and also the

24   Immigration, we didn't know the FBI was right behind it

25   undercover.  And we didn't know that because we were just

1   thinking to explain everything, how it goes with our

2   establishment.

3       With that I asked at the end of that:  Is there anything we

4   have done wrong?  Is there anything that we did not do right?

5       We, as the community, need to know so we can correct our

6   mistakes.  And they said there was nothing, everything is fine.

7       Four months later we have a letter from the Immigration

8   denying all the applications that we filed in the Immigration

9   under the adoption law.

10      I felt so badly because the law has already stated, very

11  clear to us, that the adult adoption.  So I feel like it is an

12  obstruction of law by the government, and also it is a

13  discrimination against the adult adoption through the

14  government process.

15      But anyhow, we did not file anything after that letter into

16  the Immigration.  And I can tell you, they can check them all

17  out.

18      We concentrate on the state adult adoption by the state

19  citizen.  As I said, a born citizen, which allowed the adoption

20  to be a process, a part of.  And then we went ahead and

21  continue to process according to the order of the court.

22      Because when we do this thing, it is not we do it by

23  ourself.  It is the order of the Superior Court.  We have to

24  carry this process to finish into the social security.

25      It is not me making up those things.  It is not me deciding

1    the things.  It is the law itself of the Superior Court.

2        And we did all of this, Your Honor, and we work on it.  But

3    unfortunately, I was arrested and brought in here.  And also

4    the -- can I have a bit of water?

5        Sorry, Your Honor.

6        (Brief pause.)

7        Then we end up here.  I request a speedy trial and a judge

8    trial.  I believe that a jury trial does not have enough

9    knowledge or experience to understand the legality of this

10   whole complex law because even the federal government got it in

11   a different way.  Not direct to what I'm just saying now

12   because all these things I'm saying now is pretty much new

13   around.

14       So with that, I feel so disappointed with the way this has

15   been handled, these things.  I feel so that we do not have our

16   rights anymore as a citizen.  Our constitutional right has been

17   violated, obstructed.

18       I feel like that we no longer exist in this country, but

19   we've moved from piece of law to the piece of law to the piece

20   of law, as I explained that to you, which is very, very, very

21   important for me.

22       And I can tell you now, we have done so much in the

23   community, 35 years of community oriented.  My whole life in

24   it.  I got 45 years of no criminal record.  I am a justice of

25   the peace in a common law, as you can know, Your Honor.

1     I have worked so entirely hard in the community to bring

2     them up to a different level so that they can be able to live a

3     better life here.  Because the amount of problem they have

4     here, in this country, is nobody is fixing anything, but

5     blaming everything.

6     I look at it in a different way.  I look at it in some

7     way to -- and I take the blame for all of these things, if

8     that's the way everybody looks at it.  And if that's the way

9     the presentation of the federal government, I'm not going to

10    argue with that.  There is no need for me to argue because I

11    feel that everything is all set.  It is just a matter of

12    getting my sentence.

13    Your Honor, there are millions of people over the world

14    watching the integrity of this case.  I'm standing here in

15    front of you.  I believe in justice.  I believe in everything,

16    that we be subject to kings, presidents, rulers and the

17    magistrate in honoring and sustaining law.  I believe all of

18    that.  I know that is true.  There is no doubt about those

19    things.

20    But if we understand our feeling and our rights, are we

21    pushing everything to be a fraud?

22    Are we instigating where the fraud comes from?

23    What part of the law that made this fraud stand?

24    That's what is still bugging me.  And I stand for it, for

25    whatever my life is going to be.  I am not going to change any

1  sentencing in your favor or my favor.  All I'm just telling you

2  is the truth and the facts of these things.

3      Pilate of Rome washed his hand with water.  The Jews washed

4  their hands with blood.  I stand before you here and address

5  my -- representing my company, Americans Helping America.  We

6  are innocent of all of this.  And may God help me and God help

7  ourselves.

8      Thank you very much for your time, and I appreciate it.

9          THE COURT:  Thank you.

10     Anything else, Mr. Riordan, Mr. Zindel?

11         MR. ZINDEL:  Well, Your Honor, the way you calculated

12  the guidelines has the low end at 17 and a half years.

13         THE COURT:  Has the --

14         MR. ZINDEL:  The low is 17 years and a few months.

15  And Miss Bodene, I'm sorry, it is going to be -- you will have

16  a challenge finding out where to put the periods when you

17  transcribe what Mr. Hansen said, but Your Honor, Mr. Hansen's

18  allocution is very similar to the many, many conversations and

19  to the hours of testimony and the hours of very effective

20  cross-examination by the government.  And as you said a few

21  minutes ago, I think that the one person who believes in this

22  whole project is Mr. Hansen.

23     This company, Americans Helping America, I think he viewed

24  it as his life's work, and it really meant everything to him,

25  but the question now is having set the guidelines at the point

1    where the court has set it, do you believe that he suffered at

2    the time of this offense a significantly reduced mental

3    capacity and did it contribute to the offense.  And I think

4    Dr. Lin, in his report, did an outstanding job of explaining

5    how this works.

6        Now, you just observed -- I know the government has spent

7    an enormous amount of time really viciously attacking Frank

8    Weber, who I think is a hardworking professional and wise

9    doctor, who often gives us reports saying that your client is a

10   sociopath, your client is a psychopath, there's nothing I can

11   do to help him, but this time he found, yeah, there is

12   something wrong with this guy.

13       You saw it here.  We all saw it.  And I hope Mr. Espinosa

14   and Miss Lydon saw it.  The pressured speech, the flights of

15   thought, the grandiosity, the absolutely grandiosity.

16       The truth of the matter here is that Mr. Hansen, despite

17   his view of himself and his company, I think he did, at all

18   times, have altruistic motives.

19       His idea -- and I probably only can say this after a year

20   and a half with Mr. Hansen, you know, the idea, if you step

21   back from it, is okay people, you want to be citizens, we're

22   going to put you out there, you're going to get your name,

23   you're going to become part of an American family, you're going

24   to do these things, you're going to register, get a tax ID

25   number, start paying taxes, really contribute.

1    So I mean, I can see the heart in that, even if I know --

2    even if I were not a lawyer I would know, yeah, the law does

3    not allow that to happen.  This is black and white.  It is a

4    simple matter.

5    But I do think that in Mr. Hansen's heart the intentions

6    were good, and that's what makes this process so difficult.

7    Now, what do we do with him?

8    What do we do with him given what the guidelines are?

9    And I've represented dozen and dozens of illegal aliens in

10   my career, and I am very sympathetic to the people here with

11   dreams.

12   And the people who spoke today spoke eloquently.  They lost

13   money.  They were given false hope.  And I am deeply sorry

14   about that.

15   I was struck that none of them appear to be seeking any

16   kind of vengeance here.  And none of them used the kind of

17   histrionic language or the kind of fervor the government

18   brought into its sentencing memorandum.  Its sentencing

19   memorandum, in my view, was really over the top.

20   I would say to the victims now that the court is going to

21   punish Mr. Hansen, the court is going to imprison Mr. Hansen,

22   and that punishment will be substantial, but vengeance and

23   adjectives will not play a part in that decision.

24   I believe it was Mr. Medrano who said that I hope one day

25   that he recognizes his error, and that's why I'm going to ask

1    the court to cut that sentence in half.  I'm going to ask the

2    court to give Mr. Hansen a sentence of eight to nine years.

3        And the reason is that at some point in the next two or

4    three years or four years, when Mr. Hansen is sitting on his

5    bunk in a prison, and the years have gone by and he realizes

6    the predicament he's in, he turns 70 years old, his health is

7    failing, he's going to realize that this scheme never could

8    have worked.  That this was not an idea, and that people lost

9    money because of it.  And we will not see him or hear of him

10   again.

11       You do not need to give this man 17-and-a-half years or 22

12   years or ten years to get those lights to come on.

13       He's not going to be able to rebuild AHA when he gets out.

14   He's not going to be able to do that.  He uses his own name.

15   He's grandiose.  It is an important part of it to have Helaman

16   Hansen be the center here of these altruistic schemes.  But

17   anyone who is going to Google that name is going to see what

18   happened here, so you don't need to imprison him to protect the

19   public.

20       You do need to reduce the sentence to recognize what I

21   think you have already recognized, is that he has a

22   significantly reduced mental capacity that did, in fact,

23   contribute to the offense.

24       We reserve our prison cells for the violent and the

25   dangerous.  Mr. Hansen turned 65 a couple of weeks ago.  When

1   he gets out of prison in his 70s, he's -- today, if you were to

2   release him today, he would never be violent or dangerous.

3   There is some punishment that has to ensue, but I'm asking the

4   court to impose a reasonable punishment.

5       He is a person who, despite his jail garb, thinks of

6   himself as a helper and as a successful businessman.  The truth

7   of the matter is he is a complete failure.  That light is going

8   to come on, but it is going to come on a lot sooner than ten

9   years, Your Honor.

10      So I think if the court wants to impose a sentence that is

11  not greater than necessary to achieve the aims of justice, the

12  court will impose a range of eight to nine years.

13          THE COURT:  Mr. Riordan, Mr. Zindel, I feel for you.

14  You have done everything you can possibly do for your client.

15  And listening to him in his allocution today just reinforces

16  what this court has believed all along.  He doesn't get it.  He

17  really doesn't get it, and I don't know what to say at this

18  point in time.

19      He has hurt so many people.  And even today, knowing he's

20  been convicted of all of these counts by a jury of 12 people,

21  he still believes in what he's doing and believes in himself

22  and believes that he's done what he could for all of these

23  people that he harmed in ways that we'll probably never ever

24  know.

25          He doesn't get it.

1    This matter is submitted, is it not?

2    Because I'm going to sentence him.  At this point in

3    time -- I don't know what you're going to say that is going to

4    change my view at this point in time.

5              MR. ESPINOSA:  Your Honor, I don't want to belabor the

6    point, but I want to add one thought.  It goes directly to this

7    notion that Mr. Hansen somehow believes what he is saying is

8    true.

9    He does not.  He lied over and over and over when called to

10   account.  Those lies are in the transcript of his trial

11   testimony.  They're in his recorded interviews with the FBI.

12   They were stated to these victims who spoke today and hundreds

13   of others victims.

14   In particular, in his second cross-examination at trial,

15   when Mr. Hansen was again lying, asserting that he had made

16   citizens of people between 2003 and 2012, the government -- I

17   asked him:  What about in 2005, two years into this period,

18   during which you say that you're making citizens not using INS,

19   not using the federal programs.

20   He -- it is then that he submits his own citizenship

21   application, and he doesn't use the route that he sold to all

22   those victims.  He did it the correct way.

23   That demonstrates that he clearly knows that the only way

24   to really get citizenship was to go through the steps required

25   under Federal law.  He knows the difference.

1    He's like a tax objector or defier.  He's like a sovereign

2    citizen.  Someone who comes in and insists on a reality that

3    isn't true because it is his only way out of the crimes that he

4    has committed.

5        He doesn't believe these lies, and that fact is revealed in

6    his testimony.  We ask for a guideline sentence, Your Honor.

7            THE COURT:  Let me make it clear that when this court

8    said that he seems to believe what he says, that doesn't mean

9    that he didn't know what he was saying was wrong.  He knew.

10   There is no question about it.

11       He knows it today.  He just says it.  He says what he needs

12   to say, and that's something that he believes.  But that's not

13   the issue.  What he believes is criminal, and he knows it.  And

14   he knew it, and he continued to act that way.

15       It is the judgment and sentence of this court pursuant to

16   the Sentencing Reform Act of 1984 that the defendant, Helaman

17   Hansen, will be committed to the custody of the Bureau of

18   Prisons for a term of 240 months on each of Counts 1 through 9

19   and 11 through 16, and 120 months on each of Counts 17 and 18,

20   to be served concurrently to each other for a total term of 240

21   months.

22       He will pay a special assessment of $1,700 immediately.

23   The court finds he doesn't have the ability to pay a fine so

24   the fine is waived.

25       It is further ordered the defendant will pay restitution in

1   the amount of $576,264.22 to the victims as outlined in the

2   restitution.   The payees will be as indicated on the

3   presentence report.

4       While in prison he'll pay at a rate of not less than $25

5   per quarter to the Bureau of Prisons Inmate Financial

6   Responsibility Program.   Interest on that restitution is

7   waived.

8       Upon release from imprisonment, the defendant will be

9   placed on supervised release for a term of 24 months on each of

10  Counts 1 through 9 and 11 through 18, all to be served

11  concurrently for a total term of 24 months.

12      Within 72 hours of release from the custody of the Bureau

13  of Prisons he will report in person to the probation office in

14  the district where he's released.

15      While on supervised release, the defendant shall not commit

16  any other state, federal or local crime, nor possess a firearm,

17  nor illegally possess or use any controlled substances.

18      Defendant will submit to one drug test within 15 days of

19  release from prison and at least two periodic drug tests

20  thereafter.

21      Defendant will cooperate in the collection of DNA as

22  directed by the probation officer.

23      The court will adopt the special conditions set forth on

24  page 25 of the presentence report and impose those as special

25  conditions.

1          The court finds that this sentence is sufficient but not

2     greater than necessary to punish this defendant and deter

3     others from similar criminal conduct.

4          And as indicated previously, the advisory guideline range

5     according to probation was 210 to 262 months of imprisonment.

6     The court finds that the sentence of 240 months overall is a

7     fair, just and reasonable sentence and will deter others from

8     similar criminal conduct but is not longer than necessary to

9     achieve that goal.

10         Mr. Hansen, you have the right to appeal from the sentence

11    that's just been imposed by this court.  You have ten days from

12    the date judgment is entered in this case in which to file your

13    notice of appeal.  If you cannot -- I'm sorry.  It is 14 days.

14    If you cannot afford the costs of appeal or costs of the

15    appellate attorney, those costs can be waived.  If you so

16    request it, the clerk of the court will file a notice of appeal

17    on your behalf.

18         Do you understand your rights of appeal?

19              THE DEFENDANT:  Yes.

20              THE COURT:  And I believe there is a request for an

21    institution in Northern California?

22              MR. ZINDEL:  FCI Lompoc, Your Honor.

23              THE COURT:  I'll make the recommendation to the Bureau

24    of Prisons to FCI Lompoc.  That will be subject to space

25    availability and security classification to be determined by

1    the Bureau of Prisons.

2         Anything else?

3              MS. LYDON:  A brief housekeeping matter.  My apologies

4    for not addressing the issue earlier.

5         The parties made objections to factual statements which did

6    not impact the guideline calculations.  They were not ruled on,

7    but for the sake of a clear record is it correct that those

8    disputed facts were not taken into account in calculating the

9    sentence?

10             THE COURT:  Correct.

11             MS. LYDON:  Thank you.

12             THE COURT:  The defendant will remain in the custody

13   of the United States Marshal pending delivery to the Bureau of

14   Prisons forthwith.

15        There being no other matters on calendar at this time, the

16   court will be adjourned.

17             MR. ESPINOSA:  Thank you, Your Honor.

18        (Off the record at 12:27 p.m.)

19                        ---o0o---

20

21

22

23

24

25

REPORTER'S CERTIFICATE

---o0o---

STATE OF CALIFORNIA   )
COUNTY OF SACRAMENTO )


        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.

        IN WITNESS WHEREOF, I subscribe this certificate at
Sacramento, California.


    /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
          Official United States District Court Reporter